IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01210-REB-MJW

STERISIL, INC. a Colorado corporation,

    Plaintiff

vs.

PROEDGE DENTAL PRODUCTS, INC.,
a Colorado corporation, and
MARK A FRAMPTON, an individual,

    Defendants

---

## MOTION FOR SUMMARY JUDGMENT

---

Pursuant to F.R.C.P. 56, Defendants ProEdge Dental Products, Inc. ("ProEdge") and Mark A. Frampton ("Frampton") (collectively, "Defendants") move the Court for an order granting summary judgment in their favor and dismissing all claims with prejudice.

## I. <u>INTRODUCTION</u>

Defendants are entitled to summary judgment on three issues: non-infringement, invalidity due to obviousness, and invalidity due to patent subject matter ineligibility. Discovery has shown that no genuine issue of material facts exist as to these three issues, and summary judgment is now proper to dismiss all claims.

**Infringement**: In response to an early summary judgment motion filed before the start of discovery, Plaintiff Sterisil, Inc. ("Sterisil") argued (and this Court accepted) that there was a triable issue of fact concerning whether SLS, a component of the accused product, contributes to disinfection because it was not listed as an "active" ingredient on

the packaging.  Sterisil now admits that SLS contributes to disinfection.  That admission is case dispositive and summary judgment of non-infringement should be granted.

**Validity**: Defendants submitted an expert report on several grounds including obvious under § 103.  It is undisputed that Sterisil's expert rebuttal does not refute the facts concerning the obvious combination of references.  With an unrebutted expert opinion on obviousness, Defendants are entitled to summary judgment of invalidity due to obviousness.

**Patent ineligibility**:  During discovery the inventor of Sterisil's patent admitted that the patent "essentially" covers "silver to disinfect water."  This is not an inventive concept; it is an ancient concept.  Sterisil has identified no other inventive concept.  Its expert provided no opinion on eligibility, and discovery responses provide no additional information on the issue.  Accordingly, Defendants are also entitled to summary judgment of invalidity due to patent ineligibility.

## II.    BACKGROUND

### A.  Technology Background

Sterisil alleges that ProEdge infringes Claims 3-7 of U.S. Patent No. 6,991,736 ("the '736 Patent") by selling BluTab.[1]  These asserted claims relate to continuously treated dental unit water with silver ions.  '736 Patent at [57].  Treatment is needed because dental units and waterlines become contaminated bacteria.  '736 Patent col.1, ll.14-18.  Collard Decl. Ex. 1 (ProEdge000863-64).  Even before the '736 Patent, it was common practice to clean dental waterlines using chemical treatment.  Collard Decl. Ex.

---

[1] Claims that ProEdge infringed Claims 1 and 2 were dismissed.  *See* ECF No. 56 at 5.

1 (ProEdge000869).  One such treatment, "shock treatment," intermittently flushed

dental plumbing with antimicrobial agents, such as bleach.  Collard Decl. Ex. 1

(ProEdge000869-70); '736 Patent col.1, ll.51-55.  It was also common to use water

continuously treated with an antimicrobial agent that was non-toxic to patients such as

iodine or low concentrations of certain acids.  Collard Decl. Ex. 1 (ProEdge000870);

'736 Patent col.2, ll.1-25.  Prior to the '736 Patent, methods had also been developed to

use silver ions from silver liquids or silver oxides as an antimicrobial agent in continuous

treatment systems.  Collard Decl. Ex. 1 (ProEdge000871); Ex. 2 (ProEdge000189); Ex.

3 (U.S. Patent No. 6,267,895 ("Engelhard")); Ex. 4 (U.S. Patent No. 6,544,427

("Layton")).

### B.  Patent Claims At Issue Relate to Use of Silver to Disinfect Water

As articulated by its inventor, the '736 Patent covers "[e]ssentially silver to

disinfect water."  Collard Decl. Ex. 5 at 6:12-16 (Downs Dep.).  In particular, the

asserted claims cover the use of silver ions (obtained from powder or a tablet made of

one of two common silver salts: silver citrate and silver nitrate) as the antimicrobial

agent in a continuous water treatment system.

The use of silver to disinfect water, however, has ancient roots.  In antiquity,

Roman soldiers would place metal coins in their drinking vessels and the King of Persia,

when going to war, would store water in silver vessels.  Collard Decl. Ex. 6 at ¶ 37 (Mills

Report); Ex. 7 (ProEdge000005).  While these soldiers did not understand bacteria, they

understood that silver would keep their water safe to drink.  Collard Decl. Ex. 6 at ¶ 37

(Mills Report).  By 1869, the scientific study of this effect began when experiments

showed that black mold could not grow in silver vessels.  *Id.* at ¶ 39.  By 1954, a United

States patent on the use of silver salts to create a solution to disinfect surfaces had

issued.  *Id.* at ¶ 40 (citing U.S. Patent No. 2,813,059).  Silver nitrate was known by the

13th century.  *Id.* at ¶ 38.  By 1970, a patent described how to make a tablet from silver

citrate or silver nitrate to dissolve in water that could be used as a mouthwash or to

disinfect dental appliances.  Collard Decl. Ex. 8 (U.S. Patent No. 3,518,343 ("Welsh")).

### C.  The BluTab Product

BluTab is a "waterline maintenance" tablet sold by ProEdge for continuous

treatment of dental waterlines.  Collard Decl. Ex. 9 (Sterisil CChart00014-00017).

Like the tablet described in Welsh, BluTab is a tablet made with a silver salt,

specifically with silver dihydrogen citrate.  Collard Decl. Ex. 10 (Sterisil

CChart00197).  However, BluTab tablets are made up of several other

ingredients that contribute to the overall disinfecting properties of the product.

Other ingredients include a tablet binder, a "builder" (sodium bicarbonate), a pH

buffer (citric acid), blue dye, and sodium lauryl sulfate ("SLS").  Collard Decl. Ex.

11 (ProEdge000848).

SLS, in particular, enhances the ability of silver ions to kill bacteria.  As

Sterisil itself acknowledges, surfactants "are widely used [] in formulations to

*enhance the activities of other biocides.*"  Collard Decl. Ex. 12 at 3 n.1, 7 n.3

(Sterisil's Infringement Contentions) (emphasis in original).  There is no dispute

that SLS is a surfactant.  Surfactants enhance the activity or other biocides

because they reduce surface tension.  Collard Decl. Ex. 13 at ¶ 18 (Mills Rebuttal

4

Report).  In dental plumbing, biofilm consists of bacteria enclosed in a matrix of other organic compounds that protects the bacteria from the outside environment, including disinfectants.  *Id.* at ¶ 20.  Surfactants reduce the surface tension between biofilm and water, causing biofilm to break up and resulting in better contact between bacteria and a disinfectant.  *Id.* at ¶ 21.

This synergistic effect of SLS with antimicrobials is well known and has been well documented in written publications.  *See* Collard Decl. Ex. 14 (ProEdge000777-86); Ex. 15 (ProEdge000883-888).  The synergy between SLS and silver ions in particular was also studied by Defendant, who found that SLS used in a solution with silver substantially increased the reduction in bacteria compared to silver alone.  Collard Decl. Ex. 16 (US Patent Application US2006/0254988).

Even looking at SLS through a different lens, its ability to disinfect (kill) bacteria without another disinfectant is also well known.  Collard Decl Ex. 6 at ¶ 56 (Mills Report).  One study confirms that SLS alone can be used to kill 87% of biofilm in certain applications.  Collard Decl. Ex. 17 (Dr. Sturman's Depo. Ex. 4).  It is undisputed that SLS (when combined with the other ingredients in BluTab **leaving out** Silver DiHydrogen Citrate) killed bacteria in studies conducted by ProEdge.  Collard Decl. Ex. 18 (ProEdge000850-000860).

### D.  Procedural History

 Because SLS contributes to the disinfection caused by the BluTab product, Defendants previously brought a motion for summary judgment arguing

5

that they could not infringe the asserted claims.  ECF No. 51 at 10-12.  Because

the '736 Patent is directed to the natural phenomenon of using silver to disinfect

water, Defendants also argued that the patent was invalid under 35 U.S.C. § 101.

*Id.* at 12-15.

In response, Sterisil argued that SLS is not listed as an "active" ingredient

on the BluTab label, there was a genuine issue of material fact as to whether

SLS contributes to disinfection.  Regarding invalidity under § 101, Sterisil argued

that the asserted claims had a "clear claimed structure and steps carried out with

the claimed structure."  *Id.* at 12.

In light of Sterisil's arguments, the Court denied the motion for summary

judgment, noting that "[o]n this record" summary judgment of non-infringement

was improper because there was a genuine issue of material fact as to "the role

of SLS as an active ingredient which contributes to disinfection in the BluTab

product."  ECF No. 56 at 7.  The Court also denied the motion with respect to §

101, ruling that "on the current record" invalidity had not been proven by clear

and convincing evidence.  ECF No. 56 at 9.  Importantly, that record was prior to

any discovery or infringement contentions.  After the Court's ruling, discovery

commenced and Sterisil conceded that SLS enhances the activity of biocides

(i.e. contributes to disinfection) and failed to identify any facts rebutting the

combinations of prior art that ProEdge identified as invalidating the '736 patent.

### III.    <u>ARGUMENT</u>

#### A.  Standard of Review

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  F.R.C.P. 56.  "If it affirmatively appears from the pleadings, admission, depositions, and affidavits, if any, that there is no genuine issue as to any material fact upon which the outcome of litigation depends, the case is appropriate for disposition by summary judgment, and it becomes the duty of the court to enter such judgment."  *SMS Mfg. Co. v. U.S.-Mengel Plywoods*, 219 F.2d 606, 608 (10th Cir. 1955).

**B.     BluTab Does Not Infringe Because SLS Contributes To Disinfection**

Discovery has closed and there can be no genuine dispute that SLS contributes to disinfection.  Prior to discovery, there was a dispute about the role of SLS. It is now undisputed that (1) SLS "*enhances*" the effectiveness of biocides such as silver (i.e. contributes to disinfection) and (2) SLS actually kills bacteria (i.e. disinfects). Therefore, BluTab cannot infringe any of the remaining independent claims of the '736 Patent.

The only remaining asserted claims of the'736 Patent are Claims 3-7, which are all method claims.  "Direct infringement of a method claim requires all steps of the claimed method to be performed by or attributable to a single entity."  *LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1325 (Fed. Cir. 2016).  Claims 4-6 are dependent claims of Claim 3.  "One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim."  *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (citation omitted).

i.   <u>Sterisil's admission that SLS enhances the activity of biocides means that BluTab has at least one compound other than silver that contribute to disinfection</u>

Sterisil admits that the surfactant in BluTab contributes to disinfection.  This admission requires summary judgment of non-infringement.  The two remaining independent claims, Claim 3 and 7, both require the mixing or admixing of water and a tablet (or in Claim 3 a tablet or powder) that "consist[s] essentially" of silver nitrate or silver citrate.  "[C]onsisting essentially of" has been construed to mean "consisting of no compounds that contribute to disinfection other than silver nitrate or silver citrate."  ECF No. 45 at 25-26; ECF No. 55 at 8.  BluTab's ingredients include SLS, which is a surfactant.  Collard Decl. Ex. 11 (ProEdge000848).

Previously, Sterisil claimed that the function of a surfactant was merely to keep silver ions in suspension.  ECF No. 53 at 8-10.  However, Sterisil has now admits that surfactants, such as SLS, "*enhance the activities of other biocides.*"  Collard Decl. Ex. 12 at 3 n.1, 7 n.3 (Sterisil's Infringement Contentions) (emphasis in original).  This material fact is indisputably true.  When a BluTab is used, the SLS reduces the surface tension between biofilm and the BluTab solution.  *See* Collard Decl. Ex. 13 at ¶¶ 21, 31 (Mills Rebuttal Report).  This causes the biofilm to break up and permits better mixing and contact between the bacteria and the silver ions in the solution.  *Id.*  This leads to enhanced disinfection.  *Id.*

Under the Court's claim construction Sterisil's admission that SLS "enhances" disinfection is the end of the inquiry—BluTab cannot infringe.  The Court's claim construction clearly states that the compound must "contribute to disinfection." ECF No. 45 at § 3.  It does ***not*** require that BluTab "consist of no ***disinfectants*** other than silver

nitrate or silver citrate."  *Compare* to *id.*[2]

This synergy between SLS and antimicrobials (such as silver) is not only admitted by Sterisil, but confirmed by the scientific literature and the testing data showing SLS increases bacteria reductions when combined with biocides such as silver.  *See* Collard Decl. Ex. 14 (ProEdge000777-86); Ex. 15 (ProEdge000883-888) (US Patent Application US2006/0254988); Ex. 19 (2004 MicroChem Lab Report). Previously Sterisil argued, without citation, that the testing data was not reliable.  ECF No. 53 at 8-10.  But now that discovery has closed, Sterisil must cite actual evidence of record and not merely attorney argument.  *See Thelma Jean Lambert Living Trust v. Chevron U.S.A., Inc.*, 2016 U.S. Dist. LEXIS at 818 (D. Kan. Nov. 9, 2016).

Sterisil's expert did not challenge the reliability of the testing or otherwise dispute that SLS enhances the effectiveness of biocides.  To the contrary, he included with his report a paper saying that SLS *does* enhance the activity of biocides.  Collard Decl. Ex. 20 (Linden Report Attachment F).  Sterisil's expert only opined that SLS, alone, "does not function as a disinfectant."  Collard Decl. Ex. 21 at 3 (Linden Report).  For the purposes of the '736 patent, as construed by this Court, whether *SLS* "function[s] as a disinfectant" *alone* is not the relevant inquiry.  The question is whether SLS "contributes to disinfection."  In formulating his opinion, Sterisil's expert relied heavily on a test of SLS conducted by Dr. Paul Sturman—a professor hired *by Sterisil*.  At his deposition, Dr. Sturman examined testing showing the enhanced antimicrobial activity of SLS

---

[2] As discussed below, even if that were the construction, SLS would still meet the test and BluTab does not infringe.

combined with silver and specifically stated that he "d[id]n't see any reason to doubt it,"
Collard Decl. Ex. 22 at 44:10-17 (Dr. Sturman Depo). Dr. Sturman went on to note that
the results were not surprising because SLS was "often used as a means of enhancing
the efficacy of antimicrobials." *Id.* at 45:11-13. Accordingly, now that the function of
surfactants, such as SLS, is not disputed, summary judgment is appropriate. SLS
enhances the efficacy of silver ions, and therefore SLS contributes to disinfection.

     ii.  <u>In light of Sterisil's concession, whether SLS is an "active"</u>
<u>ingredient is not relevant.</u>

While the Court found that on the pre-discovery record that there was a genuine
dispute about where SLS was an active ingredient that contributed to disinfecdtion,
given Sterisil's concession that SLS enhances the activity of biocides, whether or not
SLS is an "active" ingredient for the purposes of the EPA's labelling requirements is
simply not relevant to the claims of the '736 patent.

The EPA considers an "active ingredient" to be "any substance . . . that will
prevent, destroy, repel or mitigate any pest . . ." 40 C.F.R. § 152.3. Notably, the EPA
regulations do *not* define as an active ingredient a compound that *enhances or
contributes* to the ability of another ingredient to destroy a pest. To the contrary, the
EPA specifically notes that "inert ingredients" can "play key roles in pesticide
***effectiveness and product performance*."  Collard Decl. Ex. 28 (EPA Website). In
other words, the EPA will consider an ingredient, such as SLS, "inert" even if it improves
product performance by contributing to disinfection.

     i.  <u>Even if the appropriate question were whether other compounds</u>
<u>in BluTab disinfect alone, without silver citrate, there is no dispute</u>
<u>that they do.</u>

10

While this is not the relevant inquiry under the Court's claim construction, Sterisil argues that the incorporation of SLS into the BluTab product is irrelevant because SLS, alone, does not act as a disinfectant.  But unrebutted testing data shows that the compounds in BluTab **do** act as a disinfectant alone, without silver citrate.  Said another way, the silver citrate in the BluTab product is not the sole disinfectant because the product disinfects **without** the silver citrate.  Specifically, tests performed by Microchem show that in a short amount of time after being added to water containing bacteria, a BluTab product that was manufactured without silver dihydrogen citrate killed nearly 90% of the bacteria.  Sterisil's expert admits that when using BluTab **without** silver citrate "data shows that microbial concentrations were reduced by 80-90% of their initial concentrations" but dismisses this outcome by saying that is a "very low and poor performing disinfection process."  Collard Decl. Ex. 23 (Linden's Rebuttal Report).  But the claims do not require a particular **level** of disinfection nor is that relevant.  There is another component in the BluTab (e.g. SLS) that kills bacteria, i.e. disinfects.  There is no dispute: killing 80-90% of bacteria is disinfection.  Independent tests (which were not done on BluTab, but rather using SLS in isolation) even confirm that SLS alone can kill biofilm.  Collard Decl. Ex. 24 (Dr. Sturman's Depo. Ex. 6).  If the claims required that no other compounds in BluTab act as **a disinfectant**, (though that is not actually what the claim construction requires), BluTab still does not infringe because it is undisputed that the other compounds in BluTab killed 80-90% of bacteria,

    **C.**    **The Asserted Claims of the '736 Patent Are Invalid**

          i.   <u>The '736 Patent Is Invalid As Obvious.</u>

Defendants identified several obviousness contentions and submitted an expert report analyzing three specific combinations of prior art, each with its own lead reference, that made the '736 Patent obvious.  Discovery is now closed, and Defendants are entitled to summary judgment because Sterisil has not presented any rebuttal to Defendants' expert analysis that certain prior art combinations render the '736 patent invalid as obvious.

a.  <u>The Elements of Asserted Claims Were Disclosed in Prior Art,
and It Would Have Been Obvious To Combine Prior Art</u>

"A patent claim is unpatentable when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said such matter pertains.'"  *Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1351 (Fed. Cir. 2016) (citing 35 U.S.C. § 103)).

> Obviousness is based on underlying factual findings, including: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the claims and the prior art; and (4) secondary considerations of nonobviousness, such as commercial success, long-felt but unmet needs, failure of others, and unexpected results.

*Prometheus Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d 1092, 1097 (Fed. Cir. 2015). The "test for obviousness is what the combined teachings of the references would have suggested to those having ordinary skill in the art."  *In re Mouttet*, 686 F.3d 1322, 1332-33 (Fed. Cir. 2012). "When a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious."  *KSR Int'l Co. v Teleflex Inc.*, 550 U.S. 398, 417 (2007).

As explained by Defendants' expert, all the elements Claims 3-7 of the '736 Patent **except** the use of tablet consisting essentially of silver nitrate or silver citrate are expressly disclosed by two different prior art references: Layton and Engelhard[3].  *See* Collard Decl. Ex. 6 at ¶¶ 48-70, 107-133 (Mills Report).  Layton discloses creating a disinfectant by mixing silver with water and supplying that silver treated water to dental instruments via a waterline.  Collard Decl. Ex. 4 at col.3, l.9—col.4 l.17 (Layton); *id.* at col.4, ll.10-49, ll.56-58, fig.1.  Layton further teaches that the concentration of silver ions that can cause disinfection of live bacteria is 1 ppm to 50 ppm, and that a concentration of the range 0.02 ppm to 1.0 ppm can inhibit the growth of new bacteria.  *Id.* at col.3, l.25—col.4, l.22.  Therefore, Layton discloses all limitations of independent Claim 3 and dependent Claims 4-6, **except** a tablet (or powder) consisting essentially of silver citrate or silver nitrate.

Furthermore, Layton further discloses adding silver treated water to a water bottle before the treated water flows to the dental instruments.  *Id.* at col.4, ll.57-58.  A water bottle is an "independent reservoir."  One of ordinary skill in the art would have recognized that instead of creating the solution and adding it to the water bottle, one could also mix the solution within the water bottle itself.  Collard Decl. Ex. 6 at ¶ 128 (Mills Report).  Sterisil does not dispute this, and therefore all limitations of Claim 7, except for the tablet consisting essentially of silver nitrate or silver citrate, are disclosed by Layton.

---

[3] Engelhard actually does disclose the limitation under the doctrine of inherency, but Defendants do not base their motion on the doctrine of inherency.

Similarly, Engelhard discloses treating water with silver and ozone, and that the treated water then flows through "branch lines" to dental hand pieces and other implements.  Collard Decl. Ex. 3 at col.6, ll.46-50, 60-65 (Engelhard).  The purpose of this treatment is to cause the water flowing to the dental instruments to kill bacteria in the waterlines and dental units.  *Id.* at col.7, ll.31-34.  In other words, Engelhard expressly teaches mixing a disinfectant consisting of silver and water and supply the disinfectant to a dental instrument via a waterline in order to kill bacteria.  Therefore, Engelhard ***expressly*** discloses all limitations of Claim 3 except the use of the use of a tablet consisting essentially of a silver salt.  Engelhard also teaches the use of a silver concentration of 3 ppm, and therefore expressly discloses the additional limitations of Claims 4 and 5.  Engelhard also teaches treating water in a container and passing it over a silver cartridge before it reaches the waterlines.  *Id.* at col.6, ll.46-50 (Engelhard). Therefore, Engelhard discloses mixing in an independent water reservoir and expressly discloses all limitations of Claim 7 except a tablet consisting essentially of silver nitrate or silver citrate.  In fact, the limitation that a tablet consisting essentially of silver nitrate or silver citrate be used was added by the USPTO Examiner ***precisely because*** the Examiner found that every other limitation was expressly disclosed by Engelhard. Collard Decl. Ex. 25 (prosecution history excerpts).

The significance of Welsh is that is discloses, in express terms, the element of a tablet consisting essentially of silver nitrate or silver citrate.  Collard Decl. Ex. 8 at col.1, ll.14-25 (Welsh); *id.* at col.2, ll.8-11; col.5, ll.28-29.  In fact, Welsh even discloses using tablets to clean dental appliances.  *Id.* at col.8, ll.24-23.  Because the antimicrobial

properties of silver are so well-known, it would have been obvious to one skilled in the art that the tablet taught by Welsh could be substituted for the silver colloid taught by Layton or the silver plus ozone taught by Engelhard.  Collard Decl. Ex. 6 at ¶¶ 72-73, 93; 110-111 (Mills Report).  Just like dishwashers may use liquid, powder, or tablet soap, the use of each form of dental waterline cleaner was well-known and interchangeable within the art.  The use of a Welsh tablet in the method taught by Layton or Engelhard is merely arranging old elements, with each performing the same function it had been known to perform, to yield expected results.  Accordingly, the combination of Engelhard + Welsh *or* Layton + Welsh render the '736 claims obvious. *See KSR*, 550 U.S. at 417.

The "secondary considerations" also all support a finding of obviousness. [4]  While the presence of bacteria in dental units was known since the late 1960s, it wasn't until the early 1990s that concern about the potential for infection was heightened due to increasing numbers of compromised immune systems (which in turn was due to an aging population and viruses such as HIV).  Collard Decl. Ex. 6 at ¶ 135 (Mills Report).  Once the need was felt, there were successful attempts by others to develop solutions—including treatments with bleach, iodine, and even with silver, just to name a few.  *Id.* at ¶¶ 23-26.  There has not been copying of the '736 Patent and it is not widely licensed.  *Id.* at ¶ 136.  The '736 Patent also has not had any unexpected, superior, or praiseworthy results—it merely employs a known use of silver (disinfection) in a specific

---

[4] Sterisil also failed to answer Defendants' interrogatory asking Sterisil for its contentions regarding the secondary considerations of non-obviousness.  Collard Decl. Ex. 26 (response to rog 12).

application (continuous treatment of dental waterlines).   *Id.* at ¶ 137.

          b.  <u>Sterisil's Failure to Rebut Defendants' Expert Opinion Is Fatal to</u>
              <u>Sterisil's Case</u>

       Sterisil provided a rebuttal expert report by Dr. Linden.  But, in that report, Dr.

Linden never disputes that the combination of Layton plus Welsh was obvious.  Sterisil's

expert *does not even mention Layton*.  Nor does Dr. Linden dispute that the

combination of Engelhard and Welsh was obvious.  Nor does Dr. Linden dispute

Defendants' expert opinions regarding the "secondary considerations" of obviousness.

In fact, the word "obvious" is not even found in Dr. Linden's report, nor is "§ 103."

       The failure of Dr. Linden to rebut this obviousness analysis is fatal.  While expert

testimony is not required in every single case, where the field of art is complex (as

opposed to "easily understandable"), expert testimony is necessary.  *Invista N. Am.*

*S.A.R.L. v. M&G USA Corp.*, 951 F. Supp. 2d 626, 652 (D. Del. 2013); *see also Finjan,*

*Inc. v. Sophos, Inc.*, 2016 U.S. Dist. LEXIS 189272, at *30-31 (N.D. Cal. Aug. 22, 2016);

*Asetek Danmark A/S v. CMI U.S., Inc.*, 100 F. Supp. 3d 871, 886 (N.D. Cal. 2015).  The

technology in this case is not so simple as to be easily understood by laypersons, that is

precisely why the Court appointed a Special Master in this case.  *See* ECF No. 32 at 1

("The patent in suit concerns technology that is highly specialized and technical."); ECF

No. 44 at 1 (same).  Sterisil expressly agreed that appointment of a Special Master was

"appropriate and necessary for the reasons stated by the Court."  ECF No. 35 at 1.  The

scientific basis behind silver ion's disinfecting properties, forming tablets from silver

salts, the behavior of bacteria, structure of biofilm, and continuous water treatment

systems in dental offices are all sufficiently technical as to require expert opinion.  By

failing to rebut Defendants' obviousness analysis with its own expert opinion, Sterisil

has conceded obviousness and Defendants' are entitled to summary judgment.  *See*

*Luby v. Carnival Cruise Lines, Inc.*, 633 F. Supp. 40, 42 n.3 (S.D. Fla. 1986)

Rather than conducting an obviousness rebuttal, Sterisil's expert attacks Welsh

and Engelhard individually, without discussing combinations involving either. These

individualized attacks on prior cannot stop a finding of obviousness; "[one] cannot show

non-obviousness by attacking references individually where [obviousness] is based on

combinations of references."  *Boundary Sols., Inc. v. CoreLogic, Inc.*, 711 F. App'x 627,

631-32 (Fed. Cir. 2017) (*quoting In re Keller*, 642 F.2d 413, 426 (C.C.P.A. 1981)).

Furthermore, even if an individualized the attacks were permissible, the attacks

here are meritless.  The only attack on Engelhard is that it was considered by the

Examiner.  Collard Decl. Ex. 23 at ¶ 2 (Linden Rebuttal Report).  However, the

Examiner found that Engelhard disclosed everything other than a silver salt tablet.

Collard Decl. Ex. 25 (prosecution history).  Welsh supplies that tablet and the Examiner

never considered the combination of Engelhard with Welsh.  Sterisil's only attack on

Welsh is that it:

> do[es] not discuss or recognize the problems associated with biofilm in
> dental office waterlines or their associated components, and thus [does]
> not offer or suggest any solutions to these problems, much less suggest
> that silver nitrate or silver citrate alone (in tablet or powder form) would
> work as an appropriate disinfectant for dental waterlines in dental offices.

Collard Decl. Ex. 23 at ¶ 3(c) (Linden Rebuttal Report).

This misses the point: Welsh does not need to recognize the problem of biofilm in

dental office waterlines or suggest a solution because *Layton* and *Engelhard* both

recognize the problem and specifically suggest treatment with silver as the solution. Collard Decl. Ex. 4 at col.1, ll.41-42 (Layton); *id.* at col.ll.26-32, col.5, ll.6-10; Collard Decl. Ex. 3 at col.1, ll.16-24 (Engelhard); *id.* at col.2, ll.54-59.  Welsh merely shows it would have been obvious to one of ordinary skill that the silver could be obtained in the well-known form of a tablet of silver nitrate or silver citrate.  The Court should grant summary judgment of invalidity.

ii.  The Asserted Claims of the '736 Patent Are A Patent Ineligible Natural Phenomenon

Defendants previously moved for summary judgment because the asserted claims are ineligible under 35 U.S.C. § 101; the asserted claims attempt to patent a natural phenomenon of disinfecting water with silver.  The Court agreed that this natural phenomenon alone would not be patent eligible, ECF No. 56 at 8, but denied the motion finding that "on the current record," it could not be said as a matter of law whether the additional elements of using silver nitrate or silver citrate in tablet (or powder) form amounted to "an inventive concept."  However, under the record that was developed in discovery this issue is now ripe for decision because the inventor of the '736 Patent has conceded that it lacks an inventive concept and Sterisil's position is that patent subject matter eligibility under § 101 is a pure question of law.

The eligibility analysis is a two-step inquiry.  First, courts determine whether the patent claim at issue is directed to an ineligible concept—a law of nature, natural phenomenon, or abstract idea.  *Alice Corp., Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354-55 (2014).  Second, if it is, courts then look to whether the additional elements of the claim amount to an "inventive concept."  *Id.* at 2355.  An inventive concept is "an

18

element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (citing *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289 (2012)) (alterations in original).  An inventive concept must be more than "well-understood, routine, conventional, acitivit[ies]" previously known in the industry.  *Mayo*, 132 S. Ct. at 1294.  A patent-eligible claim requires more than reciting a natural phenomenon and adding the words "apply it."  *Alice*, 134 S. Ct. at 2357.

The first step of the analysis has already been determined: the Court previously ruled that the claims are directed to a natural phenomenon (using silver to disinfect water).  ECF No. 56 at 8.  The second step of the analysis is now ripe for decision because discovery is closed and Sterisil has not identified any additional elements amounting to an "inventive concept."  Defendants asked Sterisil in to describe the "inventive concepts" that it contended made the '736 Patent valid, and Sterisil provided no substantive response.  Collard Decl. Ex. 27 (Rog 17 and Response).  Similarly, Sterisil's expert, Dr. Linden, took no position with respect to § 101 because it "is a legal question."  Collard Decl. Ex. 23 at ¶ 1 (Linden Rebuttal Report).[5]

Significantly, the inventor of the '736 Patent testified that the patent covered using "[e]ssentially silver to disinfect water."  Collard Decl. Ex. 5 at 6:12-16 (Downs Dep.). The inventor concedes that the '736 Patent was not the first method to clean dental waterlines, or even the first method using a tablet or powder.  *Id.* at 163:15—22,

---

[5] Significantly, Sterisil's contention that patent eligibility is a pure question of law means that the clear and convincing burden of proof on Defendants no longer applies.  See *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 109 F. Supp. 3d 916, 933 (W.D. Tex. 2015) (applying clear and convincing standard only to underlying questions of fact, but deciding eligibility as a matter of law).

170:20—171:16. [6]  However, using silver to disinfect water is not an "inventive concept;" silver has been used to disinfect water since antiquity when  Roman soldiers would place metal coins in their drinking vessels.  Collard Decl. Ex. 6 at ¶ 37 (Mills Report); Ex. 7 (ProEdge000005).  This property has been scientifically studied since at least 1869.  Collard Decl. Ex. 6 at ¶ 39 (Mills Report).  Because Sterisil has not identified any inventive concept in the discovery process, no genuine issue of material fact can exist.

Use of a tablet made of silver nitrate or silver citrate is well-understood, routine, and conventional.  Id. at ¶¶ 53, 64, 74, 84.  Silver nitrate was known as far back as the 13th century.  *Id.* at ¶ 38.  Likewise, the use of tablet made from silver nitrate or silver citrate to make a solution to clean dental appliances has been known since at least 1970.  *Id.* at ¶¶ 84-85 (discussing Welsh).  Therefore, the asserted claims are not patent eligible, and Defendants' motion for summary judgment should be granted.

Respectfully submitted this 13th day of April, 2018.

/s/ Case Collard
Gregory S. Tamkin
Case Collard
DORSEY & WHITNEY LLP
1400 Wewatta Street, Suite 400
Denver, CO 80202
Telephone: (303) 629-3400
Facsimile: (303) 629-3450
Attorneys For Defendants ProEdge Dental
Products, Inc. and Mark A. Frampton

---

[6] In fact, when pressed about what was novel about his invention, rather than identify anything more specific, the inventor merely read the claims verbatim into the record. Collard Decl. Ex. 5 at 173:22—175:14 (Downs Dep.).

4844-1860-8737\5

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2018, the foregoing document, titled

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was electronically filed with

the Clerk of Court using the CM/ECF system which will send notification of such filing to

the following email address:

Ramon Pizarro
Email: ramon@ramonpizarro.com

*Attorney for Plaintiff Sterisil, Inc.*

/s/ Case Collard
Case Collard